Judgment rendered April 14, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,823-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

PINOLA PRESERVE, L.L.C.                          Plaintiff-Appellant

versus

STAR B RANCH, L.L.C.                             Defendant-Appellee

* * * * *

Appealed from the
Thirty-Ninth Judicial District Court for the
Parish of Red River, Louisiana
Trial Court No. 36,792

Honorable John M. Robinson, *Ad Hoc*, Judge

* * * * *

WIENER, WEISS & MADISON                  Counsel for Appellant
By:  Frank H. Spruiell, Jr.
      Reid A. Jones

BETHARD & BETHARD, L.L.P.                Counsel for Appellee
By:  Benjamin T. Bethard

* * * * *

Before PITMAN, GARRETT, and BLEICH (*Pro Tempore*), JJ.

**PITMAN, J.**

Pinola Preserve, L.L.C. ("Pinola"), appeals the judgment of the trial court in favor of Star B Ranch, L.L.C. ("Star B"), finding that Star B had proven it acquired ownership of approximately ten acres of land through 30-year acquisitive prescription. For the following reasons, we reverse.

## FACTS

Pinola, a landowner in Red River Parish, discovered that its southern neighbor, Star B, was claiming to own minerals underlying a portion of property to which Pinola held record title—a triangular tract of approximately 10 acres located just north of the section line in Sections 23 and 24, Township 14 North, Range 11 West, Red River Parish (the "Disputed Tract").[1]

_____

[1] Immovable property which lies on the west side of Red River and between the south section lines of Section 23 & 24, Township 14 North, Range 11 West, and an old fence line more particularly described below, said fence line being shown on that survey by Michael P. Bowman, P.L.S., dated January 9, 2019:

Commence at a 2" Iron Pipe found for corner for the North Quarter Corner of said Section 26 and also being the South Quarter corner of Section 23; thence run N89°16'23"W along the North line of said Section 26 and along the South line of said Section 23 to the intersection of the Existing Barbed Wire Fence, a distance of 21.28 feet to the Point of Beginning of the tract herein described; thence run Northeasterly and Southeasterly along the Existing Barbed Wire Fence Line through Sections 23 and 24 these next Twenty Three Calls (23):
1. N78°11'37"E a distance of 119.22, to a T-Post set for corner;
2. S89°00'21"E a distance of 224.17 feet, to a T-Post set for corner;
3. S89°23'02"E a distance of 283.34 feet, to a T-Post set for corner;
4. S89°58'32"E a distance of 225.66 feet, to a T-Post set for corner;
5. S89°16'08"E a distance of 204.86 feet, to a T-Post set for corner;
6. S89°08'47"E a distance of 219.73 feet, to a T-Post set for corner;
7. S89°17'22"E a distance of 241.34 feet, to a T-Post set for corner;
8. S89°30'19"E a distance of 250.10 feet, to a T-Post set for corner;
9. S89°12'42"E to the West Toe of the Existing Levee, a distance of 553.46 feet, to a Fence Corner Post; thence continue along an Extension of the Existing Fence Across the Existing Levee to the Existing Fence Line.
10. S89°22'42"E a distance of 416.47 feet, to a T-Post set for corner;
11. S89°28'44"E a distance of 333.56 feet,, to a T-Post set for corner;
12. S89°11'10"E a distance of 194.10 feet, to a T-Post set for corner;

On August 30, 2016, Pinola filed a petition for possession, preliminary injunction, permanent injunction and damages against Star B and alleged that Pinola and its predecessors in title had been in continuous and peaceful possession of a 673.97-acre tract of property located in Sections 23 and 24, Township 14 North, Range 11 West, Red River Parish. The Disputed Tract is part of this piece of land. Pinola claimed the area under fence of this tract comprised 658.31 acres. This tract is hereafter referred to as the "Pinola Tract."

In its petition, Pinola alleged that Star B holds property contiguous to the Pinola Tract to the south, i.e., the property south of the section line between Sections 23 and 26 and sections 24 and 25, Township 14 North, Range 11 West, in Red River Parish. This tract is referred to as the "Bolan Tract." Star B is a limited liability company owned by three Bolan siblings—Christina Bolan Sellen, Mary Kathryn Bolan DeSpain and Gregory Thomas Bolan, who acquired the property through the successions of their parents, Carolyn Bundrick Bolan and Joseph Thomas Bolan, in judgments of possession dated April 4, 2005, and October 18, 2010.[2] None

---

13. S89°28'52"E a distance of 272.32 feet, to a T-Post set for corner;
14. N89°28'33"E a distance of 237.52 feet, to a T-Post set for corner;
15. N84°52'10"E a distance of 217.99 feet, to a T-Post set for corner;
16. N84°55'56"E a distance of 296.07 feet, to a T-Post set for corner;
17. N84°00'12"E a distance of 208.57 feet, to a T-Post set for corner;
18. N83°59'54"E a distance of 307.61 feet, to a T-Post set for corner;
19. N84°08'09"E a distance of 258.99 feet, to a T-Post set for corner;
20. N84°02'48"E a distance of 296.65 feet, to a T-Post set for corner;
21. N78°48'10"E a distance of 211.69 feet, to a T-Post set for corner;
22. N71°35'16"E a distance of 131.05 feet, to the End of the Existing Fence Line herein described and to a T-Post set for corner;
23. Thence continue N71°35'16"E along an Extension of the Existing Fence line to the West Water Line of the Red River, an approximate distance of 97.09 feet, to a Point.

[2] Neither of the original judgments of possession in the successions of Carolyn and Tom Bolan include a description of the property at issue in the case before us.

of the Bolans are residents of Louisiana. The Bolan heirs conveyed the Bolan Tract to Star B on October 13, 2010.[3]

Pinola alleged that around March 30, 2012, Gregory Bolan filed a document styled, "Affidavit of Possession of Lands in Section 24 and 25 of Township 14 North, Range 11 West, Red River Parish, Louisiana" in the records of Red River Parish in Conveyance Book 359, Page 141. Gregory Bolan did not notify Pinola of the filing of the affidavit. Pinola claims the affidavit contains representations by Gregory which are not based on his personal knowledge. Gregory was not born until 1954, but the affidavit alleges many actions of possession of the property which predate his birth or which took place while he was an infant.

Pinola claims that Gregory's affidavit represents that Star B and its predecessors in title purport to have been in possession of Pinola's property in Section 24 up to a barbed wire fence which runs north of the section line between Sections 24 and 25. Pinola notes in its petition that in the affidavit, Gregory references an aerial photograph as an attachment which purports to show the fence in question; however, there is no aerial photograph attached to the affidavit as recorded in the conveyance books of Red River Parish.

Pinola alleged that the fence was not constructed until approximately 1952 and was not intended to serve as a boundary between the Pinola Tract and the Bolan Tract since all parties involved have recognized that the section line between Sections 23 and 26 and Sections 24 and 25 was the property line between the two tracts of land. Pinola also alleged that Star B

---

[3] The deed by which the Bolan heirs conveyed their interest in the tract of land south of the section line to Star B Ranch, L.L.C. does not mention the Disputed Tract of land located north of the section line in Section 24.

and its predecessors in title have always acknowledged that the section line is the boundary and that in November 1974, the Bolan heirs' father, Tom Bolan, entered into a five-year agricultural lease with Pinola's ancestor in title, H.L. Hughes. The lease described the property as being the same land shown on a plat of a survey dated October 1-7, 1912, and known as Pinola Plantation, minus lands already sold to others and as shown by the public records of Red River Parish. The 1912 plat of survey referenced in the lease stated that the south line of Sections 23 and 24 was the boundary between the Pinola and Bolan Tracts. The lease also specifically stated that the Lessee "is to surrender the said leased property peaceably at the end of the five-year term of the lease."

Pinola claims this agricultural lease is a judicial acknowledgment that as of December 31, 1979, the section line between Sections 23 and 24 delineated the property lines between the Pinola and Bolan Tracts. Pinola further alleges that the Bolans' ancestor in title was possessing the property in dispute for Pinola's ancestor in title as a predial lease and, thus, was possessing for Hughes and not himself.

Another agricultural lease was granted by Hughes in 1981 in favor of Joseph Dill, and the leased property is described as including all the lands in Section 23 and 24, Township 14 North, Range 11 West, which Pinola claims shows that its ancestor in title had continuous possession of the property at issue to the section lines between Sections 23 and 26 and 24 and 25.

Pinola alleged that in August 1999, Paul and Beverly Dickson acquired ownership of the Pinola Tract by cash sale deed from the heirs of H. L. Hughes and recorded it in the records of Red River Parish. The Dicksons conveyed the property to Pinola on March 20, 2003, and the

4

Dicksons and Pinola claim to have exercised physical possession of the Pinola Tract in its entirety up to, and including, the area south of the fence lying just north of the section line between Sections 23 and 26 and 24 and 25.

Pinola claims that it held possession of the tract without interruption for more than a year immediately prior to the disturbance caused by the filing of Gregory Bolan's affidavit and, thus, requested that Pinola be restored to possession of the tract claimed by the Bolans.

Star B answered and filed a reconventional demand seeking a judgment recognizing it as possessor of the Disputed Tract and subsequently amended its demand seeking to be recognized as its owner. Gregory Bolan's affidavit is attached to the answer and reconventional demand and describes the northern border of the Bolan tract as follows:

> [B]ordered on the north by a fence that travels along the section line common to Section's (sic) 23 and 26 and travels eastward along the section line to a point on the section line of section 24 and 25 where the fence then travels in an eastward direction slightly slanted to the north into Section 24 and travels along that path to the Red River, and as shown on the aerial photograph taken from the office of conservation website . . . and attached hereto for reference.

Star B filed a motion for summary judgment arguing it had acquired ownership of the Disputed Tract through 30-year acquisitive prescription. In response, Pinola filed a motion to set the order of trial and to determine the burden of proof, arguing that by amending its reconventional demand to seek recognition as owner, Star B had waived its possessory claim and judicially confessed Pinola's possession. Thus, the matter was converted to a petitory action.

5

Interlocutory rulings were made with regard to both pending motions. The trial court denied the motion for summary judgment, citing several genuine issues of material fact. It granted in part and denied in part Pinola's motion to set order of trial and determine burden of proof, holding that by seeking recognition of ownership of the Disputed Tract, Star B had converted the matter to a petitory action and bore the burden of proof, but also ruling that Star B had not confessed Pinola's possession of the property.

At trial, Star B, which had the burden of proof, first presented Michael Bowman, an expert land surveyor. He stated that, with reference to the Disputed Tract, the "old fence" was the north line of the property. He testified concerning an aerial photo from 2011 and stated that the fence divided the cultivated property from a wooded area and that he had found this to be the same as in earlier survey work on this area performed for the Dicksons when they bought the northern property in 1999. He further testified that he established where the corners of the property were from a 1957 survey by George Dutton. He was unsure of the date of the survey marking the corners of the property because Dutton had performed several, but he did remember that he used a Dutton survey to set the corners. He stated that the area between the section line boundary and the fence is the "legal description of the area of possession." The south boundary is the section line, and the north boundary is the fence line of the possessed property. He further stated that the acreage in the Disputed Tract was 10.592 acres, and that it was identical in 1999 and 2018. He testified that he was working with Mr. Raley, a surveyor for the Dicksons, when they were in the process of buying the property north of the section line with the southern boundary being Sections 23 and 24.

Star B's next witness was Dr. George Castille, an expert in historical geography and aerial photo interpretation. He stated that he was asked to give his opinion concerning a boundary line, which involved the location of a fence line, to be determined from various photos. His job was to make this determination by noting changes in both physical and cultural landscape. Numerous aerial photos were examined and admitted into evidence, and different areas of interest were labeled on the photos. These were areas along the Disputed Tract, generally located east to west. The areas were designated the "usage line," "wooded area" and "pathway." He discussed dark and light strips of photos, which he determined were the fence. He described the fence as disappearing within the woods because of vegetation overtaking it. He opined that there was a fence along the usage line, through the wooded area and along the pathway, as shown in a photograph from 1940.

Dr. Castille also examined many aerial photos, including those taken in 1942, 1948, 1950 and 1959, and described them for the court. He testified that these photos showed a cleared strip and vegetation growing along the fence. In regard to the photo from 1959, he opined that the significance of the linear pattern that he interpreted as being the fence illustrated trees growing along the fence and "that depicts a fence line that has been in existence for several years, by 1959." He discussed a slide of the wooded area from 1966, which was cleared out south of the fence, and stated that the cleared area was "in agriculture." He discussed other photos through the years between 1983 and up to 2017.

On cross-examination, Dr. Castille testified that the physical evidence of the fence only became obvious from photographs in 1959. He later

7

reaffirmed that it was not until the 1959 photograph that the fence became visible as a result of the vegetation growing around it.

Star B introduced evidence that it had possessed the Disputed Tract since 1940 by raising cattle on the land and by clearing all the trees on the property for the benefit of the cattle operation. The Bolan heirs testified regarding experiences they had with their grandfather, John T. Bundrick, who had cattle operations under fence by virtue of an agricultural lease from 1941 until 1951, and that Bundrick subsequently purchased the land.

Gregory Bolan testified that he lived on the Bolan Tract beginning in 1955 and that his father bought the property from his grandfather Bundrick in 1962. He stated he remembered when the wooded area was cleared and that he worked repairing the fence and cutting hay in the field. He further testified that he remembered when his father decided to lease the Disputed Tract from Hughes and approached him about it. He stated that he and his father went to Hughes's office in Natchitoches and the lease from Hughes to Tom Bolan was executed on November 19, 1974. The lease was a five-year lease that expired on December 31, 1979. He testified that his father raised cattle until about 1980 and then started row crop farming, which he discontinued in December 1994 and then leased the property to his cousin for three years. In 1998, his father leased the property to Billy McCartney, who is still farming it to this day.

Gregory Bolan also testified that it was sometime between 2007 and 2009 that McCartney told him that the Dicksons were challenging ownership of the Disputed Tract. Although the Dicksons were asserting ownership of the tract, they continued to allow McCartney to farm it because the bean crop benefited their conservation efforts by being a food source for deer.

8

The other Bolan heirs testified, as did several persons who leased their property. Bobby Yarborough testified that he worked on the property for the Bolans as farm manager from 1984 until 1994. He was asked where he thought the property line was, and he answered that it was the fence/treeline. He stated that the fence line veered off of a straight line and that the Bolans owned all the property south of the fence. He admitted he did not know what the Bolans' deed said regarding the property line, but he simply farmed from that point south of the fence.

Other witnesses who testified were Claude Bundrick and Joe Dill, both farmers who farmed on or near the Disputed Tract. Both stated that they believed the fence line was the boundary between the two tracts. Bundrick said that he believed he was farming only on Bolan property, and no one ever told him the Bolans may or may not own all the property south of the fence. Bundrick testified that he knew Mr. Dickson and that they had discussed the Disputed Tract and that Dickson had told him that he was the owner of the property. Dill testified that in February 1981, he leased property from Hughes to farm, but that he never farmed the Bolan property or near the Disputed Tract but, instead, farmed the area west of there. The lease was admitted into evidence and it gave him the right to farm anything on Hughes's property, including all of Section 23 and a fractional section of Section 24, although he was unaware that the Disputed Tract was covered by the lease. He testified that he did not prepare the affidavit that he signed, which was admitted into evidence, but he did not believe that Bolan was farming someone else's property.

Billy McCartney testified that he leased some property from Hughes, and there was not much discussion of the boundary, "just the open

property." He stated he had never seen the legal description or the 1912 survey. He was shown the affidavit he provided that said he farmed land that belonged to Hughes, but it was west of the Disputed Tract[4] and was marked in orange on the affidavit. The Disputed Tract is marked in red and borders the section line and the river. He testified that in 1998, he farmed the Disputed Tract, but believed that land belonged to the Bolans. He stated that at one time he was knowingly farming tracts belonging to both Hughes and Bolan, but that the tracts he farmed did not touch each other. After June 1999, he no longer farmed on the Hughes property and had never heard of anyone farming that land without permission.

McCartney met Mr. Dickson in person after he purchased the Pinola Tract and then McCartney called him after stakes were placed by the surveyor Dickson had hired. Dickson did not tell him not to farm the property, which McCartney was farming for the Bolans at the time. McCartney stated he had no personal knowledge of the section line, but that Dickson told him he owned it to that point and that he might have to put up a fence. McCartney informed Tom Bolan about his discussion with Dickson and Bolan was upset about the claim. McCartney stated that between 1999 and 2012, he saw Dickson out on the property several times and there was evidence of four-wheelers traversing the property and damaging some crops.

Pinola presented the testimony of Paul Dickson, member and manager of the Pinola Preserve, LLC. He testified that he bought the Pinola Tract mainly for conservation and restoration purposes. He stated that he and his sons also use the property for recreation and that they hunt and manage the

_____

[4] The land he was leased was the same as that leased to, and farmed by, Dill and covered Section 23 and a fraction of Section 24, containing the Disputed Tract.

10

wildlife populations there.  He replanted fields that were once agricultural fields as tall grass prairie and replanted bottomland hardwood forest.  He testified that his cousin, Bickham Dickson, helped him find this tract of land for sale in 1999; and, while he was considering purchasing it, he spoke to McCartney, who told him he farmed the property on both sides of the south line.  McCartney told Dickson that Bolan had also farmed both properties, including those leased to him by Hughes and those which he owned himself.

Dickson stated that he negotiated a sales price with the Hughes heirs and that, when he bought the property, he was aware of the Disputed Tract because he could see that the farming on the property was not following the section line.  He had the Raley survey done and asked the surveyors to place flags so he could possibly enclose cattle.  In 1999, he walked the entirety of the property and saw that the fence was in a decrepit condition. He stated that the fence that was on the south line "continues internally in my property."  He knew it was the same fence because the same piece of unbroken wire made a corner on the tree and continued into his property.  He testified again that he had told McCartney that he was the owner of the property south of the fence line, but that he was allowing him to farm his land.  When he told McCartney that he intended to fence the Disputed Tract to raise cows, McCartney told him that, "We don't go putting up fences down there.  We all just try to get along."  Dickson stated that each time he saw McCartney and others on the property, he would remind them that it was his land and he was allowing them to use it.  No one ever asserted adverse possession against Dickson.  Dickson also testified that he, his family and farmhands regularly drove across the Disputed Tract and entered the property to the east by the river.  He stated that there were many wild

11

hogs in the area and that he hunted up to the section line of his property. He and McCartney had several conversations regarding ownership of the property, and he was aware that both he and the Bolans claimed the Disputed Tract; however, McCartney did not want to be in the middle of the dispute. Everyone got along well until the issue of mineral rights arose as to the Disputed Tract.

The 1974 agricultural lease from Hughes to Bolan, which Pinola claims interrupted prescription on the Bolans' claim of ownership of the Disputed Tract, was entered into evidence.

Pinola's witness, Randall Grip, was admitted as an expert "in the area of review and analysis of readily available aerial photography," and in photo interpretation and photogrammetry, i.e., the making of measurements from maps. He reviewed photographs of the Disputed Tract, which were from the 1940s into the 1950s. He stated that in a photograph from 1940, there appeared to be a fence line present. That line, which was described as a lighter area, was not a fence line, but a path. He saw no evidence of a fence line through the wooded area in 1942. In the 1948 photo, there was a pathway, but not a fence. According to him, the 1940, 1942, 1948 and 1950 photographs show no evidence of a fence in the area. He did look at a photograph dated March 9, 1959, and stated that it did show cattle trails. This was the first photograph evidencing cattle operations; and he agreed with the Bolans' expert, Dr. Castille, that this was the first documented evidence of the presence of a fence.

On January 13, 2020, the trial court rendered judgment, stating that Pinola rests its case on "record" title and, alternatively, after the Hughes heirs conveyed the property to Dickson in 1999, on ten-year, good-faith,

acquisitive prescription under just title. Star B rests its ownership claim on 30-year open adverse possession via "tacking." The trial court ruled that while record title clearly vested with Pinola, Star B proved each and every element of 30-year acquisitive prescription, namely 30 years without interruption, with possession being continuous, peaceable, public and unequivocal, in accordance with La. C.C. arts. 794 and 3486.

The trial court cited the 1940 agricultural lease under which John Bundrick precariously possessed the land from 1941 until 1951, containing language that stated, "The purpose for which this lease is acquired . . . grazing and cattle raising purposes, . . ." The trial court also pointed out that the lease obligated the lessee "to place on the land before January 1, 1941. . . livestock. . ." Further, it noted that the lessee was obligated to purchase, not later than March 16, 1941, "all of the agricultural equipment, including livestock now on the plantation, and all feed stuff. . ." Thereafter, the trial court stated, "The logical conclusion is that Westdale had cows on the farm, and as early as April 1, 1940, there was a fence separating Westdale on the South from Hughes on the North. Further, the logical conclusion is that John T. Bundrick continued the cattle operation under fence subsequent to his and his siblings' purchase of November 5, 1951." The trial court also stated, "In corroboration, the George Dutton survey (Star B. Exhibit 7) of July 16, 1951, clearly shows the fence at issue."[5]

It further found that Star B had proven that the Bolans and their predecessors in title had continued the cattle operation until the Disputed Tract was cleared for row crops around 1966, and that from that date until

_____

[5] Star B's Exhibit 7 is a survey performed by George Dutton, and the fence line is drawn on it; however, it is not dated.

13

the present, the tract has been farmed to the fence line. For these reasons, the trial court concluded that Star B had proven by a preponderance of the evidence, 30-year prescription, accruing prior to the 1974 lease from Hughes to Bolan.

The trial court further stated that Pinola failed to prove ten years' acquisitive prescription because it was unable to show good faith. Dickson purchased the property knowing that there was a property dispute because the fence veered off the section line and encroached on property he believed was his. The Disputed Tract was transferred to him without warranty, and the purchase price was adjusted so that he paid the Hughes heirs for only that portion of land "under fence." It further stated, "The legal boundary between Pinola and Star B is declared to be the fence line as described in the Bowman survey of January 9, 2019; and Star B Ranch, L.L.C., is declared the legal owner of the entirety of the disputed tract."

## DISCUSSION

*Judicial Confession of Possession*

Pinola argues that the trial court committed legal error in declining to find that by asserting ownership in its reconventional demand, Star B confessed Pinola's possession of the Disputed Tract. It contends that the trial court's decision is directly contrary to the plain language of the code article which prohibits cumulation of these two exclusive actions.

In support of this argument, Pinola asserts that when the defendant in a possessory action asserts title in himself, he thereby converts the suit to a petitory action and judicially confesses the possession of the plaintiff in the possessory action. It argues that this matter presents an issue of law which is

14

reviewed *de novo* and that under this standard, no deference is given to the district court's ruling.

Star B argues that it is nonsensical for it to judicially confess possession in Pinola because it has the burden of proving possession for 30 years if it wants to prove its ownership of the Disputed Tract. It claims that it presented overwhelming and irrefutable proof at trial that it had, and still has, possession of the Disputed Tract. It also points out that it cannot claim on one hand to be in possession of the property, while on the other hand, confess that Pinola is in possession of the property.

The possessory action is one brought by the possessor of immovable property or of a real right therein to be maintained in his possession of the property or enjoyment of the right when he has been disturbed, or to be restored to the possession or enjoyment thereof when he has been evicted. La. C.C.P. art. 3655. The petitory action is one brought by a person who claims the ownership, but who is not in possession, of immovable property or of a real right therein, against another who is in possession or who claims the ownership thereof adversely, to obtain judgment recognizing the plaintiff's ownership. La. C.C.P. art. 3651. When the defendant in a possessory action asserts title in himself, in the alternative or otherwise, he thereby converts the suit into a petitory action and judicially confesses the possession of the plaintiff in the possessory action. La. C.C.P. art. 3657. Comment (d) to La. C.C.P. art. 3657 states that the second paragraph of the article changes the law and not only permits the defendant to convert the suit into a petitory action, but provides that he does so whenever he injects the issue of ownership through his answer.

In the case at bar, Star B did convert the suit from a possessory action to a petitory one; and, thus, the trial court erred in ruling that Star B did not judicially confess Pinola's possession. However, because the trial court also ruled that Star B bore the burden of proof in its claim of acquisitive prescription of 30 years, and the ruling of this court is that Star B failed to meet its burden, the error, if any, regarding confession of possession was harmless error.

This assignment of error is without merit.

*Thirty-year Acquisitive Prescription*

Pinola also argues that the trial court erred in finding that Star B acquired ownership of the Disputed Tract through 30-year acquisitive prescription prior to 1974. It contends that Star B did not meet every requirement of 30-year acquisitive prescription because it failed to show proof of possession within visible bounds. It asserts that Star B had to provide proof that the possession was continuous, uninterrupted, peaceable, public and unequivocal. It also argues that because Star B's acquisitive prescription claim involves the setting of a boundary, it was required to prove possession up to that physical boundary. It argues that Star B's claim to the Disputed Tract relies heavily on a now decrepit barbed wire fence located on its side of the section line. No one knows when, why or by whom the fence was constructed, pointing out that its expert on fences, Randall Grip, opined that based on the aerial photos, there was no evidence of the encroaching fence until 1959.

Pinola further argues that in a boundary-acquisitive prescription action, prescription does not begin to run until a physical landmark, or the boundary, is established. Therefore, the trial court erred in ruling that

16

prescription began to run in the 1940s, and the time for the beginning of prescription did not begin to run until sometime after 1950. If the beginning of the running of prescription is deemed to be the 1950s, it claims prescription was interrupted in 1974 with the agricultural lease from Hughes to Bolan; and, as a result, Star B failed to accrue 30 years of uninterrupted possession.

Star B argues that the evidence was sufficient to prove its 30 years of uninterrupted possession and, therefore, acquisitive prescription of the property.

Ownership and other real rights in immovables may be acquired by the prescription of 30 years without the need of just title or possession in good faith. La. C.C. art. 3486. For purposes of acquisitive prescription without title, possession extends only to that property which has been actually possessed. La. C.C. art. 3487. Actual possession must be either inch-by-inch possession or possession within enclosures. *Brunson v. Hemler*, 43,347 (La. App. 2 Cir. 8/13/08), 989 So. 2d 246, *writ denied*, 08-2297 (La. 12/12/08), 996 So. 2d 1119. An enclosure is any natural or artificial boundary. La. C.C. art. 3426, comment (d). The party who does not hold title to the disputed property has the burden of proving actual possession within enclosures sufficient to establish the limits of possession with certainty, by either natural or artificial marks, giving notice to the world of the extent of possession exercised. *Brunson v. Hemler*, *supra*.

The possessor must have corporeal possession, or civil possession preceded by corporeal possession, to acquire a thing by prescription, and the possession must be continuous, uninterrupted, peaceable, public and unequivocal. La. C.C. art. 3476.

17

To acquire possession, one must intend to possess as owner and take corporeal possession of the thing. La. C.C. art. 3424. Corporeal possession is the exercise of physical acts of use, detention or enjoyment over a thing. La. C.C. art. 3425. Possession may be exercised by the possessor or by another who holds the thing for him and in his name. La. C.C. art. 3429. Thus, a lessor possesses through his lessee. *Id.* A precarious possessor, such as a lessee, is presumed to possess for another although he may intend to possess for himself. La. C.C. art. 3438.

The requisite possession to support a possessory action is identical to the possession required to commence the running of acquisitive prescription. *Brunson*, *supra*, *citing Strain v. Aaron*, 49,647 (La. App. 2 Cir. 2/27/15), 162 So. 3d 553. The question of whether acts constitute possession is a factual determination that will not be disturbed on appeal absent manifest error. *Strain*, *supra*.

When one party relies on title and the other party on acquisitive prescription, the party relying on title will prevail unless the adversary establishes his ownership by acquisitive prescription. *Bowman v. Blankenship*, 34,558 (La. App. 2 Cir. 4/4/01), 785 So. 2d 134, *writ denied*, 01-1354 (La. 6/22/01), 794 So. 2d 794, *citing Pace v. Towns*, 33,071 (La. App. 2 Cir. 4/5/00), 756 So. 2d 680.

The evidence in this case showed that John Bundrick, the Bolan heirs' grandfather, leased the Bolan Tract from Westdale Corporation from 1941 until 1951 for cattle operations. The undated Dutton survey shows a fence present when Bundrick bought the Bolan Tract. He continued the cattle operation until 1962 when the tract was sold to Bundrick's son-in-law, Tom Bolan. Other than the possible existence of a fence and presence of cattle on

18

the Bolan Tract, the record does not have evidence of acts of possession by Bundrick in relation to the Disputed Tract during the 1940s. There was no evidence presented at trial which suggested that any fence existed to control the cattle or to mark a boundary. Star B's witness did not attempt to determine the age of the fence, and the expert eventually admitted that the fence was not visible in photographs until 1959. There was no evidence presented regarding when, why or by whom the fence was constructed. Star B failed to show that it had continuous, uninterrupted, peaceable, public and unequivocal possession of the property.

Based on the evidence presented, the record does not support the trial court's finding that Star B had proven acquisitive prescription of 30 years prior to 1974. The *assumption* of the trial court that possession had been proven did not meet the strict and necessary evidentiary requirements of the law and, thus, was error. For these reasons, we find that the trial court committed manifest error in finding that the Bolan heirs and their predecessors in title possessed the Disputed Tract inch-by-inch or within a physical boundary.

Because the trial court did not address any of the evidence regarding further possession of the Disputed Tract after 1974, this court must examine the evidence presented to determine if there were other acts of possession which would have met the requirements of 30-year acquisitive prescription by the Bolans.

If the prescriptive period could have been considered to have begun in 1956, based on the fence shown in the Dutton survey and the testimony of the Bolan heirs that they recalled their father checking on cows and mending fences when they were children, the prescriptive period would have been

19

interrupted by virtue of the 1974 lease of the Disputed Tract by Hughes to Tom Bolan. That lease recognized that the leased property extended to the section line by making reference to a 1912 survey showing the Section 23 and 24 line as the southern boundary of the Pinola Tract. This shows that Bolan was not possessing the Disputed Tract for himself, but on behalf of Hughes, Pinola's ancestor in title. The lease specifically stated that the lessee was to surrender the leased property peaceably at the end of its five-year term. When the lease ended in December 1979, Hughes leased the property to Dill in 1981, even though Dill did not farm the Disputed Tract. The property was then leased in 1985 to McCartney.

It is not disputed that Hughes and Pinola had just title. The evidence shows that Hughes used and possessed the Pinola Tract to the boundaries described in his title by executing a number of mineral and agricultural leases covering the Pinola tract. These leases indicate that Pinola's ancestor in title possessed as owner with the intent of possessing all that was included within the boundaries described in the record title. His heirs' transfer of the land to the Dicksons included title to the land down to the section line and encompassing the Disputed Tract.

The evidence does not show that Star B exercised continuous, uninterrupted and unequivocal possession of the disputed property after 1980 when the 1974 Hughes-to-Bolan lease expired. In fact, Hughes continued to lease the property to others; and when the Hughes heirs sold the property in 1999 to Dickson, it was being farmed by McCartney, who mistakenly thought he was farming on the Bolans' property. There was no evidence presented by Star B of "inch-by-inch" possession or possession within enclosures, as required by law. Therefore, Pinola's assignment of

20

error has merit.  As a result of this finding, the discussion of the final assignment of error is pretermitted.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court and declare Pinola Preserve, L.L.C. to be the owner of the Disputed Tract, as per the property description contained in the trial court's Judgment and in this opinion.  Costs of this appeal are assessed to Star B Ranch, L.L.C.

**REVERSED AND RENDERED.**